UNITED STATES *v.* THREE THOUSAND EIGHT HUNDRED AND EIGHTY
BOXES, etc.

*(District Court, D. California.* June 2, 1882.)

CUSTOMS DUTIES—SMUGGLING—CONDEMNATION OF PROPERTY SEIZED.

> Where a quantity of opium was seized by officers, the burden of proof is on
> the claimant to show that the property seized was of domestic manufacture and
> not liable for customs duties; and if he fails to explain the difficulties of the
> case by the production of proofs within his power to produce, "condemnation
> follows from the defects of testimony on the part of such claimant." And
> where the claimant has it in his power to produce the best and most satisfactory
> evidence to repel the presumption which the law has raised against him, and
> he omits to do so and contents himself with the weaker evidence, the presump-
> tion is "turned against him that the highest and best evidence going to the
> reality and truth of the transaction would not be favorable to the defence."

*A. P. Van Duzer,* Asst. U. S. Atty., on behalf of the United States.
*Geo. W. Towle, Jr.,* for claimants. *W. H. L. Barnes,* of counsel.

HOFFMAN, D. J.   On the night of the third of January, between 12
and 1 o'clock, as officers Egan and Smith, of the harbor police, were
on duty patrolling the bay along the city front, their attention was
attracted to a boat, which, when first discovered, was at a short dis-
tance from the stern of the steamer City of Tokio, then recently
arrived from China.   They at first supposed it to be the custom-
house lookout boat, but observing that she had pulled out from the
stern of the steamer their suspicions were aroused, and they gave
chase.   The boat they were pursuing seemed desirous of escaping,
but as she was heavily laden, and was rowed by only one pair of
sculls, while their own boat was light and rowed by both officers, she
was soon overhauled.   When they had approached within a short
distance of the boat the officers hailed her and ordered her to stop.
Whether the order was obeyed they are unable to state, as the boat's
oars were muffled.   On coming along-side the boat the officers
inquired of the men in charge of her what they had on board.   The
reply was that they did not know.   One of the officers then put out
his hand and felt one of the packages.   He at once recognized by
the sound that it was a tin case, and concluded that the package con-
tained opium.   The men were then placed under arrest and hand-
cuffed.   They were much excited, and repeatedly begged the officers
to take the stuff and let them go.   The officers refused to listen to
their entreaties, and the boat was taken to the Folsom-street wharf, in
tow of the patrol boat, when the men were landed, and by officer
Smith conducted to the nearest police station.

Officer Egan remained in charge of the boat and its contents, and while awaiting officer Smith's return he observed a man looking around as if trying to discover where the boat was. After the return of officer Smith, and while the opium was being landed on the wharf, both officers approached the man who had been observed on the lookout. He declined to speak with them both, saying, "One at a time; I want to do business with one at a time." Officer Smith then withdrew, and the man, who gave his name as Kennedy, offered Mr. Egan at first $2,000 and subsequently $10,000 if he would let the arrested men go; telling him he might "keep the stuff," that he did not want to be exposed, etc. This proposal was rejected by the officer. Substantially the same propositions were made to officers Smith and Metzler, the latter of whom had come from the police station to assist in unloading the boat. To each of these officers he claimed to be interested in or to be the owner of the boat and her cargo. He said his name was Kennedy. One of the parties arrested, and who has since been indicted, is named Kennedy, and is the claimant in the present suit. On the crew list of the steamer City of Tokio appears the name of Kennedy as steerage steward. There are said to be three brothers of that name.

I have omitted to mention that to one of the officers the Kennedy who appeared on the wharf stated that he was regularly engaged in the smuggling business, and that if the officer would discharge the prisoners he would put him "in the way of making many a dollar;" and to another, when proposing that he should keep "the stuff," he offered to show him where he could sell it. The admission of this testimony was strenuously objected to on behalf of the claimant, unless it should be shown *aliunde* that Kennedy was connected with the goods or with the claimant. I think it clearly admissible as part of the *res gestæ* or circumstances attending the seizure. The inquiry here is not as to the guilt or innocence of persons accused of smuggling, but as to the guilty or innocent character of the goods seized. Any circumstance tending to show that they were illicit or smuggled goods can be proved with a view of impressing on them a guilty character. Nor can any proper narrative of the seizure be given if any material circumstance attending it be omitted.

Some time after midnight, on a boisterous and stormy night, a deeply-laden boat, with muffled oars, is discovered in the immediate vicinity of a recently-arrived China steamer. When overhauled the men in charge profess ignorance of her lading. She is found to be laden with 100 packages, each containing 40 five-tael boxes of opium,

the value of which was in the neighborhood of $20,000. On being arrested the men in charge made repeated offers to surrender this valuable property as the price of their liberation; and a short time after, when the boat has reached the wharf and before the contents are unladen, a person who had apparently been on the watch approaches the officers with offers of large bribes, claims to be the owner of or interested in the goods, and avows himself engaged in the smuggling business. Certainly no one of these circumstances should be withheld from the knowledge or withdrawn from the consideration of any one seriously inquiring into the true character of the goods in question. *U. S.* v. *Nine Trunks,* 6 Rep. (N. S.) 613.

On the morning after the seizure the packages were taken to the United States appraiser's building and delivered to the custom-house authorities. They consisted of 194 tin cases, each containing 20 five-tael boxes of opium. These tin cases and the boxes containing the opium in external appearance exactly resembled the cases and boxes in which opium is imported from China. So close was this resemblance as to brands, stamps, labels, etc., and the size and shape of the packages, that it was impossible to distinguish, by any external signs, the seized opium from the imported article.

In further proof that the goods under seizure were foreign imported opium the prosecution called a Chinese witness, who professed to be an expert, and testified that he had been employed at Hong Kong in the manufacture of opium. A sample of the opium seized was presented to him. After testing it in the presence of the court, by burning and smoking, he pronounced it to be of Hong Kong manufacture.

It was also shown on the part of the United States that by the regulations of the custom-house a duty-paid stamp is attached to all packages of foreign opium which have been regularly imported and entered. No such stamps were found on the packages under seizure. It is unnecessary to dwell on this circumstance, for it is not pretended that duties have been paid on the goods on trial. The defence, when subsequently developed, was based on the contention that they were of domestic manufacture and not subject to duty. On these proofs the court was of opinion that not only had a clear case of probable cause of seizure been made out by the government, but that a very strong *prima facie* case for condemnation had been shown, and that the *onus probandi* was on the claimant.

Before proceeding to examine the proofs offered by the claimant, what constitutes probable cause, and what is the nature of the "bur-

den of proof" which the law casts upon him, must first be considered.

Section 909 of the Revised Statutes of the United States is as follows:

"In suits or informations brought when any seizure is made pursuant to any act providing for or regulating the collection of duties on imports or tonnage, if the property is claimed by any person the burden of proof shall be upon such claimant: provided, that *probable cause* is shown for such prosecution, to be judged of by the court."

This provision, which was originally adopted in 1799, has been frequently applied and expounded by the courts. In *Locke* v. *U. S.* 7 Cranch, 339, *Marshall*, C. J., observes:

"It is contended that probable cause means *prima facie* evidence, or, in other words, such evidence, as in the absence of exculpatory proof, would justify condemnation. This argument is very satisfactorily answered on the part of the United States by the observation that this would render the provision totally inoperative. It may be added that the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation, and in all cases of seizure has a fixed and well-known meaning. It implies a seizure made under circumstances which warrant suspicion. In this, its legal sense, the court must understand the term to have been used by congress."

In the case of *John Griffin*, 15 Wall. 33, the supreme court says: "The case as thus made amounts to something more than the probable cause which, by section 71 of the act of 1799, throws the *onus probandi* on the claimant of the vessel. It is a clear *prima facie* case, and, both by the statute and the ordinary rules of evidence, required of the claimant such testimony as should *satisfactorily rebut* the presumption of guilt which it raised." These observations apply with equal force to the case at bar. There can, I think, be no doubt that a *prima facie* case for condemnation was made by the government, and that the *onus probandi* was thrown upon the claimant, and it became his duty "to satisfactorily rebut the presumption of guilt which it raised." This duty could only be discharged by the production of the best evidence of which the nature of the case admitted. In the case of *The Luminary*, 8 Wheat. 407, the supreme court says:

"When the *onus probandi* is thrown on the claimant in an instance or revenue cause by a *prima facie* case made out on the part of the prosecution, and the claimant fails to *explain the difficulties of the case* by the production of papers and other evidence which must be in his possession or under his control, *condemnation follows from the defects of testimony on the part of the claimant.*"

It will be noted that in the case at bar there were not merely "difficulties" to be "explained," but positive testimony that the goods were of Hong Kong manufacture, and that they had not passed through the custom-house. If so, they must necessarily have been smuggled; a conclusion strongly corroborated by all the circumstances attending the seizure.

In the case of *Clifton* v. *U. S.* 4 How. 247, the supreme court says:

" Under these circumstances the claimant was called upon by the strongest consideration, personal and legal, if innocent, to bring to the support of his defence the very best evidence that was in his possession or under his control. This evidence was certainly within his reach, and probably in his counting-room; namely, the proof of the actual cost of the goods at the place of exportation. He not only neglected to furnish it and contented himself with weaker evidence, but even refused to furnish it on the call of the government, leaving, therefore, the obvious presumption to be turned against him that the highest and best evidence going to the reality and truth of the transaction would not be favorable to the defence.

" One of the general rules of evidence, of universal application, is that the best evidence of disputed facts must be produced of which the nature of the case will admit. This rule, speaking technically, applies only to the distinction between primary and secondary evidence; but the reason assigned for the application of the rule in a technical sense is equally applicable, and is frequently applied to the distinction between the higher and inferior degree of proof, speaking in the more general and enlarged sense of the terms, when tendered as evidence of a fact. The meaning of the rule is not that the courts require the strongest possible assurance of the matters in question, but that no evidence shall be admitted which, from the nature of the case, supposes still greater evidence behind in the parties' possession or power; because the absence of the primary evidence raises a presumption that if produced it would give a complexion to the case at least unfavorable, if not directly adverse, to the interest of the party. * * * For a like reason, even in cases where the higher and inferior testimony cannot be resolved into primary and secondary evidence, technically, so as to compel the production of the higher, and the inferior is therefore admissible and competent without first accounting for the other, the same presumption exists in full force and effect against the party withholding the better evidence, especially when it appears or has been shown to be in his possession or power, and must and should in all cases exercise no inconsiderable influence in assigning to the inferior proof the degree of credit to which it is rightfully entitled. It is well observed by Mr. Evans, (2 Evans' Pothier, 149,) in substance, that if the weaker and less satisfactory evidence is given and relied on, in support of a fact, when it is apparent to the court and jury that proof of a more direct and explicit character was within the power of the party, the same caution which rejects the secondary evidence will awaken distrust and suspicion of the weaker and less satisfactory, and that it may well be presumed if the more perfect exposition had been given it would have laid open deficiencies and objections which the more obscure and uncertain testimony was intended to conceal."

Guided by the principles thus clearly enunciated by the supreme court, I proceed to consider, as briefly as may be, the evidence offered by the claimant to repel the vehement presumption of guilt raised by the case made by the prosecution.

The first evidence on the part of the defence was the testimony tending to show that the opium in question was not, and could not have been, taken from the Tokio.

It seems that, from some grounds not explained, the custom-house authorities had been led to suspect that an attempt to smuggle opium from the Tokio was in contemplation. The force of night watchmen was therefore increased, and the necessity of vigilance strongly impressed upon at least some of them. All the watchmen on duty on the night in question, including both watches,—those on duty up to and after 12, midnight,—were examined. They denied having seen any goods taken from the ship. It may be conceded that so large a quantity of opium, exceeding in weight a ton, could not have been discharged from the steamer into a boat along-side without the complicity of the watchmen on board the vessel, or gross and almost inconceivable negligence on their part. These witnesses, therefore, appear on the stand to exonerate themselves by their own testimony from the imputations which the theory of the case advanced by the government casts upon them. They are not disinterested witnesses. I speak now of the watchmen on the deck of the steamer. The discharge of the opium, if it in fact occurred, might easily have escaped the notice of the watchmen posted on the wharf. In estimating the credibility of those who must have witnessed the transaction, if it took place, the circumstances under which they appear upon the stand are not to be lost sight of.

Both of the harbor police officers testify that when they had approached within a short distance of the Tokio they were hailed from the steamer. To the inquiry what boat that was, they replied, "Police boat." I see no reason whatever for discrediting their statement. They have proved their fidelity under circumstances which, to officers less honest, might have presented an irresistible temptation. It is a fact worthy of notice that all the night watch deny having heard these hails.

In rebuttal of the Chinese expert testimony offered by the government, the claimant produced other Chinese experts to show that the opium seized was manufactured in this city.

With a view of testing their skill or veracity the government produced from the bonded warehouse several boxes of opium proved to

have been recently imported from China. These, with other similar samples of the opium under seizure, were carefully wrapped up and submitted to the experts, under circumstances which seemed to preclude the possibility of their knowing from which of the two lots of opium the particular sample submitted to them was taken. They proceeded to test them by burning, inhaling, etc., in most instances subjecting the sample to several tests. In almost every instance they pronounced the seized opium to be San Francisco opium, and the custom-house opium to be Hong Kong opium. These experiments must, I think, in fairness be taken as establishing the fact that the witnesses were able to distinguish the seized from the custom-house opium by the tests they applied. But this is all they establish.

The further and vital fact that the seized opium was of San Francisco manufacture rests upon their declarations of their opinion. No proof was offered to show that only one kind or quality of opium is manufactured at Hong Kong. I presume I am at liberty to notice the generally-accepted commercial fact that opium prepared for smoking is largely manufactured in China, both from the India opium and from the native article.

The defence relied on, as has been already stated, was that the opium seized was manufactured in this city from imported crude opium. The suspicious circumstances attending the seizure are explained by the suggestion that the object of the midnight expedition of the boat with muffled oars, etc., was to clandestinely place the opium on board the steamer City of Sydney, then bound to Honolulu, with a view of smuggling it into that port, where, being a prohibited article, it commands a high price. If such be indeed the facts of the case, they afford, whatever may be thought of the morality of the enterprise, a valid defence to this prosecution, for no offence against the laws of the United States has been committed.

But the court, when such a defence is set up, has a right to exact that it should be satisfactorily made out by the production of the best proofs that the nature of the case will admit. The fraud relied on as a defence was not only a fraud upon the laws of a friendly foreign power, but a fraud upon the American owners of the City of Sydney, who were to be not merely cheated of their freight, but exposed to confiscation or severe penalties if the proposed smuggling adventure should be detected by the Hawaiian authorities.

In support of this defence a witness was called who testified that he was a water-tender on board the City of Sidney, and that he was employed to secure and secrete on board of this steamer a boat-load of

opium on the night of the seizure. His story was not unaccompanied by improbabilities; but as he stated that the engagement was made with him alone, and that he alone was on the watch to receive the opium, the statement could not readily be disproved. It received no corroboration from the claimant, who forbore to offer himself as a witness.

But, assuming it to be true, it bears but remotely and indirectly upon the vital issue in the case. It may be true that the claimant proposed to smuggle this opium into Honolulu, and it may also be true that he had previously smuggled it into this port.

In further support of the defence set up, a drayman, named Sheridan, testified with great minuteness of detail to having hauled, by order of the claimant, on the evening of the seizure, two dray-loads of goods to a wharf on the city front, where they were transferred to a boat in waiting to receive them. These goods, the drayman stated, he received at a store in the Chinese quarter from a Chinaman whom he pointed out in court. The testimony of this witness was wholly uncorroborated, notwithstanding that corroboration was easy if the story was true. Neither the claimant nor the boatman, nor the Chinaman from whom the opium was said to have been obtained, was called to the stand.

To rebut this testimony the United States produced three witnesses who testified that Sheridan spent the whole of the evening in question in their company at the Theatre Comique, a free-concert saloon in this city. The credibility of these witnesses was vehemently assailed by the counsel for the claimant. No formal attempt to impeach them, however, was made. From their cross-examination it appeared that they were young men of respectable families, but probably somewhat addicted, as unfortunately is too common in this city, to idleness, and perhaps dissipation. I see no reason for absolutely discarding their testimony. It must be accepted as at least casting a doubt upon the truth of Sheridan's statement, and as seriously impairing the strength of the case, which the claimant was bound to make out by satisfactory proofs.

A driver in the employment of Sheridan was also called by the prosecution. He testified that on the night in question he slept in the stable where Sheridan's horses and dray were kept, and that they were not taken out of the stable during the night. Upon this witness I place little reliance. He was unable to identify the night in question except by the fact that it was his habit to sleep in the stable. But it was shown by other testimony that his habits were very irregular,

and he disclosed unmistakable signs of personal hostility to Sheridan. The last and most perplexing circumstance connected with this case remains to be considered. The opium seized was packed in tin cases, each containing 20 five-tael boxes. In every one of the cases that was opened was found a fragment of a newspaper, published in this city, of a date so recent as to preclude the possibility of its having been sent to Hong Kong and there inserted in the cases when they were packed. These pieces of newspapers must therefore have been introduced into the cases after their arrival at this port, and as the lids or covers of the cases were found closely soldered, the operation would have required much time and very extensive complicity or extraordinary negligence on the part of the officers in charge of the vessel.

But, on the supposition that the opium was in fact manufactured in this city and packed here, with what object could these papers have been inserted in the cases? The suggestion was thrown out at the trial that it might have been to apprise the accomplices at Honolulu of the true character of the opium. But this could more easily have been done by letter or communicated orally by the claimant, who, it is said, was to accompany the goods to Honolulu. A more probable motive would seem to be, to furnish the apparent evidence of the domestic manufacture of the goods, which is now relied on in this case. If, then, the opium was of domestic manufacture, and the papers were inserted to furnish evidence of that fact in case of seizure, why was not the simpler and more effectual method resorted to of procuring from the custom-house authorities stamps which, by the regulations, may on the application of the manufacturer be attached to all packages of manufactured opium? But these stamps would, it is to be presumed, have been furnished only after an investigation and the verification of the true character of the goods, by ascertaining when and by whom they were manufactured, where the crude opium was obtained, and when and by what vessel imported. It may not unreasonably be suspected that the parties were not prepared to invite such an investigation, especially as in the trial of this case they have studiously withheld all information on these points, which, if established in their favor, would have furnished a complete and unanswerable defence to the prosecution. The foregoing presents, it is believed, a sufficiently complete statement of the proofs offered on the part of the claimant. It is evident that the case presents but a single issue of fact, viz.: Was the opium manufactured in this city or imported? The claimant contends that a

quantity of opium weighing more than a ton and of the value of nearly $20,000 was manufactured in this city, purchased by him, and placed in a boat to be clandestinely laden on board the City of Sidney. The *onus probandi* was on him to establish these facts, and by the production of the best evidence the nature of the case admitted. He was himself a competent witness. He is not produced on the stand. The person from whom his drayman states he obtained the opium, though present in court, is not called as a witness. If so large a transaction in fact occurred, he could no doubt have corroborated the statements with regard to it by the production of his books and an account of the mode in which he was paid. He could have indicated the name of the manufacturer, and the latter could have shown the place of the manufacture, how and from whom he obtained the crude opium, and, possibly, when and by what vessel it was imported. If the facts be as contended by the claimant, the more searching the inquiry the more clearly would the truth have been made manifest. Evidence on these points, though within his reach, he has withheld. He has not even called the boatman to corroborate his drayman, though the latter was contradicted by three witnesses.

It was suggested at the bar that the claimant might be unwilling to appear on the stand where, on cross-examination, he might be compelled to make compromising disclosures with regard to his operations in the Sandwich islands and his confederates in that kingdom. But he and one of his employes are under indictment for a crime for which, if convicted, they may be sent to the state prison. A large amount of property is staked upon the result of the cause now on trial. If the facts be as he claims, his testimony in support of them would go far to secure the restoration of the goods and his exoneration from the charge for which he is indicted, while his silence has, under the decisions, a most damaging, if not fatal, effect upon his cause. It would seem that the inducements to him to testify, if the facts be as the defence claims, are far stronger than any motives for silence afforded by the fear of compromising his associates at Honolulu, or of breaking up his illicit but lucrative operations at that port.

My conclusion is that no plainer or stronger case could be presented for the application of the rules of decision laid down by the supreme court in the cases which have been cited, viz., that where the burden of proof is thrown upon the claimant, and he fails to explain the difficulties of the case by the production of proofs within his power to produce, "condemnation follows from the defects of testimony on the part of the claimant;" and, further, that where the claim-

ant has it in his power to produce the best and most satisfactory evidence to repel the presumption which the law has raised against him, and he omits to do so and contents himself with the weaker evidence, the presumption "is turned against him, the highest and best evidence, going to the reality and truth of the transaction, would not be favorable to the defence."

I do not deem it necessary to examine the proofs of other illicit operations in Hong Kong by the claimant, which seem to be afforded by his intercepted correspondence. I place the decision of the case on the grounds above indicated. A decree of condemnation must be entered.